UNITED STATES of America,
Plaintiff,

v.

Derrick D. DAVIS, Defendant.

No. 01–CR–30135–MJR.

United States District Court,
S.D. Illinois.

Jan. 8, 2002.

James L. Porter, Assistant U.S. Attorney, Fairview Heights, IL, for Plaintiff.

Phillip J. Kavanaugh, III, Assistant Federal Public Defender, East St. Louis, IL, for Defendant.

## MEMORANDUM and ORDER

REAGAN, District Judge.

### I. Introduction

A September 20, 2001 indictment charges Derrick D. Davis with possessing cocaine base, with the intent to distribute it, in violation of 21 U.S.C § 841. Davis' trial was set to commence on December 18, 2001. On November 27, 2001, he moved to suppress various statements and physical evidence. That motion was fully briefed by December 7, 2001, and the Court set an evidentiary hearing for January 7, 2002. Witnesses and exhibits were presented on January 7th, and testimony continued on January 8th. The Court then took the motion under advisement. Having carefully reviewed the evidence and heard counsel's arguments, the Court now rules on the various suppression issues.

### II. Relevant Facts

On August 29, 2001, Special Agent Brandon G. Whittaker of the Metropolitan Enforcement Group of Southwestern Illinois ("MEGSI") was working in Washington Park, Illinois. MEGSI agents, along with Deputy United States Marshals, Illinois State Police Troopers and other law enforcement officers had planned an enforcement action or raid on a local tavern called Niecey's Place, which was known to be

frequented by narcotics offenders. Around 2:00 a.m., Agent Whittaker arrived at Niecey's in a white oversized van, accompanied by Canine Officer Fred Scholl, his dog "Dax," and members of the Illinois State Police Tactical Response Team ("TRT"). They parked near the intersection of 49th Street and Bunkum, almost directly in front of the tavern.

Exiting the white van, Agent Whittaker observed an older model burgundy Delta 88 pull up to the stop sign at the intersection of 49th and Bunkum. Scholl and Dax immediately pursued a suspect from the tavern. Whittaker followed Scholl, assisted in handcuffing the suspect, and then went back toward the intersection to ascertain that the TRT officers were safe and in place around the perimeter of Niecey's. Immediately Whittaker noticed that the burgundy vehicle was still sitting at the stop sign on 49th Street. The Delta 88 had been stopped in that position for 1 to 2 minutes at that point.

According to Whittaker, although there were squad cars and unmarked police vehicles in and around the tavern, sufficient room remained for the Delta 88 to pull through the intersection and away from the scene of the raid. At this time, officers other than Whittaker were undertaking pursuit of a second suspect outside the tavern, and a number of tavern patrons were being questioned in the adjacent parking lot. Agent Whittaker was assigned to "front perimeter security" on the Niecey's raid. He was concerned about the occupants of the burgundy vehicle and wanted to make sure that they posed no threat to the officers on the scene. Agent Whittaker also believed it was odd that the burgundy car had not attempted to drive away from the scene.

Agent Whittaker approached the burgundy car to investigate. The car contained two occupants. The driver was not wearing a seat belt. Whittaker asked the occupants: "What's going on, guys?" Whittaker immediately detected an odor of alcohol on the driver. He observed that the driver's eyes were "glazed over" and "thoroughly bloodshot." Based on his training and experience (including 80 to 100 arrests for driving under the influence), Whittaker believed the driver was under the influence.

Whittaker asked the driver if he had been drinking. The driver nodded slowly in the affirmative. Whittaker noted that the driver's reactions were slow, his speech was slurred, and his breath smelled of alcohol. Whittaker asked the driver to step from the car. The driver did so, exhibiting a lack of balance and leaning on the car to steady himself as he got to his feet. Whittaker directed the driver to lie on the ground, for safety concerns, and then spoke to the passenger. As he was speaking to the passenger and watching him lie down on the ground, Whittaker heard a noise that sounded like the "tinkling" of keys hitting the ground. He turned and observed the driver's arm outstretched. Whittaker asked the driver if he had just thrown the car keys. The driver responded: "I didn't do nothing, man."

Whittaker ran the registration of the burgundy Delta 88. It was registered to an individual named Andre Ward. Whittaker asked the driver if he owned the car. The driver said yes. Whittaker asked the driver if his name was "Ward." The driver said no. The driver had identification in his back pocket revealing him to be Derrick Davis. When Whittaker ran Davis' name through the Illinois State Police computer system, Whittaker learned that Davis did not have a valid driver's license. Having seen Davis drive the burgundy car up to the stop sign, Whittaker arrested and handcuffed Davis. Davis remained on the ground handcuffed, and Whittaker

turned his attention to the passenger of the Delta 88, Michael Devine.

Devine has an older sister who had a child with Derrick Davis' brother. Devine is a photographer and takes pictures at local clubs (including Niecey's). On the night in question, Devine rode with Davis to Niecey's. Devine drank two cans of Budweiser beer and bought two beers for Davis at Niecey's in the roughly 1.5 hours they were in the tavern. Devine did not have a valid driver's license at that time.

During the time that Whittaker was interacting with Devine, United States Deputy Marshal John Andrews, who has been with the Marshals Service for 19 years, arrived on the scene at Niecey's. Andrews was driven to the scene by Deputy Marshal Larry Kelly. As they drove down 49th Street toward the raid, Andrews saw an individual running from police officers around the back of the tavern. Andrews jumped out of the car and briefly assisted the other officers in apprehending this individual. That took between 3 and 10 minutes. Andrews then walked toward the front of the building, up to the intersection where Agent Whittaker was involved with the occupants of the Delta 88. Whittaker asked Deputy Andrews to watch Derrick Davis. At that time, Davis was on the ground, handcuffed.

Andrews attempted to "visit" and make polite conversation with Davis. Andrews noticed that Davis was unable to hold his head up to talk, had slurred speech, and could not carry on a conversation. Andrews believed that Davis was under the influence of alcohol.

Andrews clearly saw the position of the stopped Delta 88, the position of the TRT's white van, and the position of 5 or more police cars on the East side of Bunkum Road. Andrews recalled that the white van was parked almost directly in front of Niecey's, close to the stop sign, but it was *not* blocking the intersection of 49th and Bunkum.

As the Court notes below, conflicting testimony was presented by the witnesses at the suppression hearing on the issue of (a) how the Delta 88 came to be stopped at the intersection, and (b) whether the driver of the vehicle (Defendant Davis) could have pulled through the intersection or was, in effect, blocked by the police vehicles involved in the Niecey's raid. Having observed the verbal and non-verbal behavior of the witnesses, and having carefully assessed their demeanor while testifying, the Court finds fully credible Deputy Marshal Andrews' testimony that the Delta 88, while stopped at the stop sign on 49th Street, could have pulled through the intersection, turned on Bunkum, and driven away. Indeed, Andrews testified that a Washington Park police vehicle that was not part of the enforcement operation that night actually pulled up and through that area while he was standing nearby, thus demonstrating that a route of egress did exist at 49th and Bunkum.[1]

After arresting Davis (the driver of the Delta 88) and determining that Devine (the passenger of the Delta 88) lacked a valid drivers' license, Agent Whittaker decided to have the Delta 88 towed. Pursuant to Illinois State Police procedures, Whittaker called for the burgundy vehicle to be towed and conducted an inventory search of the car prior to the tow. In the locked glove compartment were 64 baggies of a

---

1. As to *why* Davis stopped his car at the intersection, the Court rejects (does not find credible) the testimony of Michael Devine that an officer in a full run, in active pursuit of a suspect, dashing past the Delta 88, shouted back at Davis and Devine "Shut off the car."

Moreover, in Davis' own statement (Govt Exh. 2, p. 2), Davis admits that he "could have driven around" the white TRT van and through the intersection, but he "was in awe of all the commotion" and "just sat there for a minute because I was so surprised."

substance later determined to be crack cocaine. Davis was transported to St. Clair County Jail and held pending investigation. Devine, who was permitted to obtain some camera equipment that had been in the back of the burgundy Delta 88, was released.

Roughly 12 hours following the arrest, Agent Whittaker met with Davis at the jail. After determining that Davis was alert and sober, Whittaker read David his *Miranda* warnings. Davis signed a MEGSI interrogation form which contained the *Miranda* rights. That form was admitted into evidence at the suppression hearing as Government's Exhibit ("Govt Exh.") 1. Next to each of the warnings, *e.g.,* "You have the right to remain silent," Derrick Davis placed his initials. At the bottom of the form, Davis signed his name. The form is dated 8/29/01, reflects a start time of 2:34 p.m. (when Whittaker presented the form to Davis after informing him of his rights) and reflects an end time of 2:36 p.m. (when Davis signed the form).

Whittaker then began to ask Davis about the events of the previous night, talking through those events chronologically. Whittaker used a second MEGSI form, one entitled "Voluntary Statement" (Govt Exh. 2). Referring to the top of the statement form, Whittaker again advised Davis of his *Miranda* rights, and Davis again acknowledged (and initialed to confirm) his understanding of these rights. Furthermore, Whittaker acknowledged that he was knowingly waiving those rights and making a voluntary statement.

Agent Whittaker gave Davis the option of writing down his own statement or having Whittaker write it down for him. Davis chose the latter alternative. After Whittaker wrote down the statement on the form, Davis read it through, corrected certain items, initialed those corrections, and signed the form. The three-page statement is dated 8/29/01 and bears the time 3:34 p.m. Agent Whittaker testified, and the Court finds this testimony credible, that he made no threats or promises to Davis and that he did not force or coerce Davis to make the statement.

In the statement (Govt Exh. 2, pp. 2–3), Davis admitted that, at the time of his arrest, he had been drinking since noon on August 28th, he was driving a vehicle at the time, he stopped to watch the police chase in the area because of his fascination with law enforcement activity, he possessed the crack cocaine found in the glove box of the vehicle, and he was going to distribute the cocaine (he had "broken down the crack into smaller pieces to sell and put each one into its own little baggie").

### III. *Analysis*

#### A. *Overview of Davis' Suppression Motion*

Davis makes several arguments for suppression. First, he argues that he was lawfully operating a motor vehicle in Washington Park when he was approached by Agent Whittaker. He argues that Whittaker had no cause to detain him and no reason to arrest him, and this illegal detention and arrest render unconstitutional the vehicle search, including the search of the glove compartment where the narcotics were discovered.

Davis further contends that neither he nor the passenger consented to the car search, and no warrant was obtained for the car search, so the Court should suppress the 64 baggies of crack cocaine found in the glove box. Finally, Davis maintains that the interrogations both at 49th and Bunkum and at St. Clair County Jail violated his Fifth and Sixth Amendment rights and were the product of coercion, so his statements must be suppressed. The Court finds merit in none of these arguments.

## B. The Initial Detention of Davis

■ Police may not stop an individual for questioning based on merely an "inchoate and unparticularized suspicion or hunch." *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Fourth Amendment requires a minimal level of objective justification for making the stop. *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Simply put, an officer must have reasonable suspicion, supported by "specific and articulable facts," that an individual has committed, is committing, or is about to commit, a crime. *U.S. v. Raibley,* 243 F.3d 1069, 1074 (7th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 175, 151 L.Ed.2d 121 (2001).

The Seventh Circuit thus holds that the initial detention of an individual is justified:

> if the police officer is stopping and briefly detaining "a person for investigative purposes, so long as the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' "

*U.S. v. Brown,* 232 F.3d 589, 592 (7th Cir.2000).

To briefly stop or question an individual, police do not need proof that a crime has occurred. Rather, *Terry* demands only facts necessary to support a reasonable suspicion that a crime *may have* occurred or that the person stopped *may be* involved in criminal activity.

> After all, the purpose of a Terry stop is not to accuse, but to investigate. Even facts susceptible of an innocent construction will support the decision to detain an individual momentarily for questioning, so long as one may rationally infer from "the totality of the circumstances" . . . that the person may be involved in criminal activity.

*Raibley,* 243 F.3d at 1074.

■ In the case at bar, contradictory testimony was admitted as to how Davis' car came to be stopped at the intersection of 49th and Bunkum. Passenger Devine testified that as they pulled up to the stop sign at the intersection, an officer running by to apprehend a suspect yelled at them "Shut off the car." Another defense witness, Cortez Cherry, testified that Davis' car did not have a clear path in which to depart the intersection by turning on to Bunkum. As was explained above, however, the Court finds credible the testimony of Deputy Marshal Andrews (and Agent Whittaker) that Davis had a clear path and could have driven through the intersection, turning left or right on Bunkum. Davis' own voluntary statement confirms that he could have driven the car away but chose to stay in place at the intersection, because he was in "awe" of the police activity going on around him.

Also clear is the fact that Agent Whittaker did not actually stop Davis. Davis already had stopped his car at the intersection. The stopped car sat in the midst of a large-scale police action, including a canine chase and multiple suspect pursuits. Whittaker, charged with securing the front perimeter of Niecey's, simply approached Davis' vehicle to investigate. Assuming his conduct was not merely a consensual encounter but rose to the level of an investigatory or *Terry* stop, Whittaker certainly had the "reasonable suspicion" needed to approach and briefly question Davis.

Whittaker thought it strange that Davis remained stopped at an intersection at 2:00 in the morning. Whittaker was legitimately concerned about the safety of the officers involved in various pursuits of suspects in the streets and lots around Niecey's. Assuming Davis was *Terry-*

stopped, Whittaker was permitted to briefly detain Davis for questioning, because the facts and circumstances suggested that Davis might have been—or was about to be—involved in criminal activity. *See United States v. Boden,* 854 F.2d 983, 992 (7th Cir.1988).

### C. *Davis' Arrest*

An arrest is proper if the facts available to the officer at that time "were objectively sufficient to warrant a prudent person in believing that [the Defendant] was in the process of committing some offense." *Whren v. U.S.,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *U.S. v. Moore,* 215 F.3d 681, 686 (7th Cir.), *cert denied,* 531 U.S. 915, 121 S.Ct. 271, 148 L.Ed.2d 197 (2000).[2]

A police officer has probable cause to make an arrest "when the facts and circumstances within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense." *Mounts,* 248 F.3d at 714–15, *quoting U.S. v. Sawyer,* 224 F.3d 675, 678–79 (7th Cir.2000). Probable cause requires neither evidence sufficient to support a conviction nor evidence demonstrating that it is more likely than not that the suspect committed a crime. *U.S. v. Burrell,* 963 F.2d 976, 986 (7th Cir.), *cert. denied,* 506 U.S. 928, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992). If the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists. *United States v. Levy,* 990 F.2d 971, 973 (7th Cir.1993).

■ Here, Whittaker had probable cause to arrest Davis. Davis stopped his car in the midst of a law enforcement action. Several police pursuits were underway. Police officers were nearby. Agent Whittaker was curious that Davis' vehicle pulled up at the stop sign and remained there, rather than driving out of the area. Once he walked up to the vehicle, Whittaker smelled the alcohol on Davis' breath, observed Davis' blood-shot eyes, heard Davis' slurred speech, watched Davis' unsteady movements, and learned that Davis did not have a valid driver's license. Clearly, Whittaker had probable cause to arrest Davis.

### D. *The Search of Davis' Vehicle*

■ As a preliminary matter, the Court notes that Davis has standing to challenge the search of the vehicle. Fourth Amendment rights are personal and may not be vicariously asserted. *U.S. v. Torres,* 32 F.3d 225, 229 (7th Cir.1994), *cert. denied,* 513 U.S. 1116, 115 S.Ct. 912, 130 L.Ed.2d 794 (1995). A defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if he demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure. *Id.* at 229–30.

■ For a defendant to establish standing with respect to a vehicle, he must demonstrate a legitimate expectation of privacy in the car he was driving at the time of the search. *Torres,* 32 F.3d at 230. A driver who does not own the vehicle still may have standing to challenge a search of the vehicle, but he must present evidence showing that he has a legitimate expectation of privacy in the area searched. *Id.* The evidence established that although the car he was driving still was registered to

---

**2.** The officers need not be correct in believing an offense has been committed. "The probable cause standard permits reasonable mistakes by arresting authorities based on the information then and there available." *United States v. Mounts,* 248 F.3d 712, 714–15 (7th Cir.2001).

Andre Ward, Davis was purchasing it on installments from Ward, and he had sufficient expectation of privacy to challenge the search. So, the Court proceeds to assess the constitutionality of the vehicle search.

■■■ A warrantless inventory search is permissible if (1) the individual whose possession is being searched has been lawfully arrested, and (2) the search satisfies the Fourth Amendment standard of reasonableness, *i.e.*, it is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures. *U.S. v. Lozano*, 171 F.3d 1129, 1131 (7th Cir.), *cert. denied*, 528 U.S. 946, 120 S.Ct. 362, 145 L.Ed.2d 283 (1999). Evidence discovered during such a "regularized inventory process" is admissible, and inventory polices can require the opening of closed containers and the listing of their contents. *U.S. v. Cotnam*, 88 F.3d 487, 496 (7th Cir.), *cert. denied*, 519 U.S. 942, 117 S.Ct. 326, 136 L.Ed.2d 240 (1996).

Applying the two-part standard of *Lozano*, part one has been satisfied, as the Court already has found that Derrick Davis was lawfully arrested. The remaining inquiry is whether the policies of the Illinois State Police (of which MEGSI is a unit) cover inventory searches of vehicles about to be towed, and whether those policies include searches of closed containers or locked compartments within the vehicles. If an established policy or procedure does cover such searches, Davis' challenge to the car search fails. Bearing note is the fact that the policy or procedure need not be in writing. *See Lozano*, 171 F.3d at 1132, *citing U.S. v. Duguay*, 93 F.3d 346, 351 (7th Cir.1996), *cert. denied*, 526 U.S. 1029, 119 S.Ct. 1274, 143 L.Ed.2d 368 (1999).

Here, the Illinois State Police have a written policy or "Directive" on towing (Govt Exh. 3). The Directive provides that tow services will be used to remove any vehicle or boat following custodial arrest, as well as for the removal of abandoned or disabled vehicles. Significantly, the Directive further states that the officer completing the tow report shall make an "examination and inventory of the contents of all vehicles," including any area in which an owner or operator would "store property or equipment in the vehicle," such as "console, glove compartment, map case, ... and trunk and engine compartment" (*id.*, p. 1).

■■■ Two years ago, the Seventh Circuit, affirming the ruling of a District Judge in this very Court, reiterated that "warrantless inventory searches of impounded vehicles by authorities pursuant to a standard police policy or procedure do not violate the Fourth Amendment." *U.S. v. Jackson*, 189 F.3d 502, 508 (7th Cir.), *cert. denied*, 528 U.S. 979, 120 S.Ct. 432, 145 L.Ed.2d 338 (1999), *quoting South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Similarly, the car search in the case *sub judice* was a valid inventory search.

### E. Davis' Statements at the Scene

The law of this Circuit recognizes three categories of police-citizen encounters:

> The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment "seizure," but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's

voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment.

*U.S. v. Scheets,* 188 F.3d 829, 836 (7th Cir.1999), *cert. denied,* 528 U.S. 1096, 120 S.Ct. 837, 145 L.Ed.2d 703 (2000), *citing U.S. v. Johnson,* 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied,* 498 U.S. 1051, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991).

 Whittaker's initial interaction with Davis falls into either category two or three—an investigatory stop justified by reasonable suspicion or non-coercive questioning that did not even constitute a seizure. Either way, the statements made by Davis at the scene were voluntary, not "fruit of the poisonous tree," and not subject to suppression.

### F. *Davis' Statements at the St. Clair County Jail*

 As to the statements made at the St. Clair County Jail, Davis was advised of his *Miranda* rights and chose to knowingly, voluntarily waive those rights. There is no credible evidence that Davis was threatened or coerced into signing the waiver form or making a statement. Indeed, the statement itself (Govt Exh. 2, p. 3) reads, in Davis' handwriting: "I have made this statement of my own free will." The statement also contains the pre-printed words: "I hereby voluntarily agree to make the following statement which is made of my own free will, without promise of reward [or] favor, without fear or threat of physical harm, without coercion, and without offer of leniency by any person or persons" (*id.,* p. 1). Just above this, Derrick Davis signed his full name. Just below it, Derrick Davis placed the initials "DD" next to handwritten words:

> "THIS STATEMENT WAS WRITTEN BY AGENT WHITTAKER AT MY REQUEST."

In the written statement, Davis admitted to possessing and selling the crack cocaine found in the glove compartment. Seventh Circuit law holds that "a confession is voluntary if the totality of the circumstances demonstrates that it was the product of rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will." *U.S. v. Kontny,* 238 F.3d 815, 818 (7th Cir.), *cert. denied,* 532 U.S. 1022, 121 S.Ct. 1964, 149 L.Ed.2d 758 (2001), *quoting U.S. v. Lawal,* 231 F.3d 1045, 1048 (7th Cir.2000), *cert. denied,* 531 U.S. 1182, 121 S.Ct. 1165, 148 L.Ed.2d 1024 (2001).

Davis presented testimony at the suppression hearing from his girlfriend, Stephanie Reynolds. Reynolds was pregnant in August 2001, when Davis was arrested and taken into custody. Both Reynolds and Agent Whittaker testified that Whittaker permitted Davis to telephone Reynolds and talk with her before he made his statement. Reynolds testified that she spoke briefly with Agent Whittaker, from whose cell phone Davis was calling Reynolds. Whittaker informed Reynolds that Davis was caught with crack cocaine, was being held in custody, was not cooperating, and wanted to talk with her. When Whittaker explained that Davis was in serious trouble, Reynolds began crying and got upset. Davis got on the phone and told Reynolds he was "sorry." Reynolds suggested that Davis should cooperate, because she did not want him locked up for a long period of time, unable to "see the baby."

No evidence whatsoever supports a claim that Davis was coerced, threatened, tricked, or forced into making any statements at the St. Clair County Jail. Coercion is analyzed from the perspective of a reasonable person in the position of the

suspect. *U.S. v. Brooks,* 125 F.3d 484, 492 (7th Cir.1997).

Factors relevant to that determination are the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep. Narcotics, alcohol, and fatigue also may be considerations in a particular case.

*U.S. v. Huerta,* 239 F.3d 865, 871 (7th Cir.2001).

Davis had been advised of his rights, was sober, was alert and in good mental state, and was not subjected to any physical punishment. The fact that he was permitted to telephone his girlfriend and the fact that she implored him to cooperate do not indicate, much less prove, that he was coerced to make a statement. Having received his *Miranda* warnings and indicated that he understood those rights, Davis chose to make a statement to Agent Whittaker. That statement was voluntary, was not obtained through any violation of any constitutional rights, and is admissible.

### IV. *Conclusion*

The Court DENIES Defendant Davis' suppression motion (Doc. 14). The deadline for further motion filing has passed. Trial will commence at 9:30 a.m. on Tuesday, February 5, 2002. Counsel and Defendant Davis should be present in the courtroom by 9:00 a.m. to discuss any preliminary matters before the commencement of jury selection at 9:30 a.m. Prosecution and defense counsel should submit a complete set of jury instructions (with each "clean" instruction paper-clipped to its corresponding marked instruction) to Law Clerk Sheila Hunsicker on or before Friday, February 1, 2002.

**IT IS SO ORDERED.**

